Miguel Angel ZAPATA, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–99–077 CR.

Court of Appeals of Texas, Beaumont.

Submitted Jan. 27, 2000.

Decided April 26, 2000.

---

Lynn Martin, Conroe, for appellant.

Michael A. McDougal, Dist. Atty., Peter C. Speers, III, Asst. Dist. Atty., Conroe, for State.

Before WALKER, C.J., BURGESS, and STOVER, JJ.

## OPINION ON RECONSIDERATION

DON BURGESS, Justice.

Pursuant to Tex.R.App. P. 50, we withdraw our opinion of February 23, 2000, and substitute the following in its place.

A jury convicted Miguel Angel Zapata of capital murder and punishment was assessed at life in the Texas Department of Criminal Justice—Institutional Division. Zapata raises six issues on appeal.

### FACTS

Alice Williams, a phone operator with United Cab[1], received a phone call the evening of July 3, 1996, to dispatch a taxi to Willis, Texas. Donald Pearson took the call and was last heard from before 9:00 p.m. Pearson did not respond to radio calls or pages to his beeper.

Early in the morning on July 4, Bobby Lagway observed a car near the bus barn and a man laying on the ground, half out of the car. Lagway started to get the police when he ran into Christopher Carter. They went back, looked at the body, and then proceeded in separate cars to locate the police. Carter found an officer at the Stop and Go, told him what had happened, and led the officer to the scene.

Detective Eddie Davis, a Crime Scene Unit Investigator with the Conroe Police Department, responded to the scene and proceeded to look for evidence. A wallet was found in the open pasture several hundred feet from the victim's body. Some of the contents were found scattered only ten or fifteen feet from the body. Through various forms of identification located at the scene, the deceased was identified as Donald Pearson. The taxi had a bullet hole in the windshield.

---

1. The taxi company is also referred to in the record as Conroe Cab Company, Conroe Woodlands Taxi, and Woodlands Cab.

Detective Carl Jones of the City of Willis Police Department observed tire tracks showing "the tire prints driving down to the gate of the Willis barn area, turning around, coming back northbound going on the grassy area and up in that area." On September 4, Detective Jones spoke with Christopher Lee Brock regarding the incident. Brock implicated Lejuan Golden, and Golden implicated Thomas Kyles, Jr. From the information received from Brock, Golden and Kyles, Detective Jones determined Zapata was involved. Zapata was taken into custody and gave a written statement.

The evidence adduced at trial reflects that on the afternoon of July 3, Golden and Brock went to the home of Danny Williams and borrowed a .22 revolver. They proceeded to Zapata's house. Thomas Kyles, Jr. was already there and popping firecrackers with Zapata's older brother. Golden was armed with a .22 caliber pistol. Zapata and Golden were shooting guns at a basketball goal and a tree in the backyard.

Kyles, Golden, Brock and Zapata walked from Zapata's home to the movie theater at the Woodcreek Shopping Center, where Brock called a taxi. When the taxi arrived, Kyles sat in the front passenger seat, Brock sat in the back seat behind the driver, Zapata sat in the back behind Kyles, and Golden between Brock and Zapata. Golden directed the taxi to a location in Willis by a bus barn behind a school. When the taxi arrived, Brock and Kyles got out. Brock said as he was about to pay the driver, he saw that Golden had a black gun in his lap. Brock turned and ran away from the taxi and heard a gunshot. He heard three shots altogether; the second and third shots were not as loud as the first. Brock then turned and ran back to the taxi where he saw Zapata holding a chrome-colored gun. Kyles testified that after he got out, he saw Zapata "start over and shoot." Zapata fired two shots from a .22 revolver Kyles had seen at Zapata's house earlier. Kyles saw Golden shoot the deceased with a nine millimeter Kyles had also seen at Zapata's house. Golden was sitting behind the driver when he fired.

Brock did not know who pulled the driver out of the taxi, but Kyles said he saw Zapata pull the driver out. All four got in the taxi, with Zapata driving, and drove a short distance before turning around and returning to the scene. They stopped the taxi, got out, and began running to the home of Golden's aunt.

Kyles saw Golden take Pearson's wallet and Kyles took a beeper. Brock saw Golden carrying a wallet and a blood stain on Zapata's shirt. Kyles also saw blood on Zapata's shirt.

The four ran to the home of Golden's aunt where Kyles called to arrange a ride home. According to Brock, they never discussed robbing Pearson, nor did Zapata take anything from Pearson.[2] Kyles also testified there was no plan to rob Pearson.[3]

Early the next morning, Golden and Brock returned the revolver to Williams. Subsequently, Danny's mother found the gun and took it to her sister, Callie Pogue, to lock it up. At trial, Pogue identified a .22 revolver as the gun she turned over to the police.

Dr. Vladimir Parungao, assistant medical examiner with the Harris County Medical Examiner's Office, testified Pearson sustained three gunshots to the head. One entrance wound was on the right side above the right ear. Another was on the back of the head, with the exit wound on the forehead. The third entrance wound was on the right side of the head. Two bullets were recovered from inside the head.

---

2. Brock pleaded guilty to aggravated robbery in exchange for a fifteen-year sentence in the Texas Department of Criminal Justice—Institutional Division.

3. Kyles pleaded true to engaging in delinquent conduct in exchange for a seven-year sentence to the Texas Youth Commission.

Officer Jimmy Chilcutt of the Conroe Police Department recovered three latent prints inside the taxi. Two were from the "doorjamb of the passenger side" of the taxi and matched Kyles. The third was taken from the "inside door handle of the driver's side" and matched Zapata. Leonard Mikeska, an investigator with the Montgomery County District Attorney's Office, went to Zapata's resident and recovered two bullets embedded in a tree "which appeared to be .38 caliber or .380 caliber."

David Tanner, a firearms examiner with the Montgomery County Sheriff's Office, testified that ballistics tests confirmed one of the .22 bullets removed from Pearson's head was fired from the .22 revolver recovered from Pogue. Tanner recovered a spent .380 projectile from underneath the dash pad of the taxi. The .380 bullet recovered from the taxi and the .380 recovered from the tree in Zapata's yard were fired from the same weapon.

Zapata's written statement was admitted into evidence and read to the jury. According to the statement, Zapata, Brock, Golden and Kyles were "thinking and talking some crazy things." Before they got in the taxi, Zapata saw the gun in Golden's hands, wrapped in a sock. Zapata "told him what was he going to do with that. He said don't worry it's all about money." Golden shot the driver as Zapata was getting out of the taxi, according to Zapata he heard shouting as Brock and Kyles were hiding; then they came back. Somebody opened the door; he was sure it was Kyles. Kyles said he wanted to drive. Golden and Brock told him not to and told Zapata to drive. The body was half-way out of the car because Kyles had pulled it half-way out. Zapata went around the car and "pulled too." He drove around the curb and back around the dirt. Then they left the car and ran. Brock dropped "the B.B. gun" and tried to find it. Upon returning home, Zapata "rapidly went to throw away the shirt, shoes, and pants" he was wearing in the dumpsite at the car

wash behind his house. Golden took the .22 with him.

## SUFFICIENCY OF THE EVIDENCE

In his first and second issues, Zapata argues the evidence was both legally and factually insufficient to support his conviction because there is insufficient evidence the theft of the victim's wallet "was anything more than an afterthought." The Court of Criminal Appeals "has defined 'in the course of committing' an offense listed in section 19.03(a)(2), supra, as conduct occurring in an attempt to commit, during the commission, or *in the immediate flight after the attempt or commission* of the offense. In order for the murder to qualify as capital murder under section 19.03(a)(2) of the Texas Penal Code, the intent to rob must be formed prior to or concurrent with the murder." *Robertson v. State*, 871 S.W.2d 701, 705 (Tex.Crim. App.1993) (emphasis added) (citations omitted).

The evidence establishes Zapata and his friends obtained guns and practiced shooting them. They called a taxi when they had no destination and directed the driver to an isolated location. Upon arrival, the driver was shot three times in the head. The driver was then removed from the car and his belongings taken. We find the record contains evidence from which a jury could rationally conclude the intent to obtain control of Pearson's property was formed before or during the commission of the murder. *See Whitaker v. State*, 977 S.W.2d 869, 873 (Tex.App.—Beaumont 1998, pet. ref'd). Considering the evidence in the light most favorable to the prosecution, we conclude a rational trier of fact could find Zapata guilty beyond a reasonable doubt of the aggravating element. Issue one is overruled. Further, considering all of the evidence, without the prism of "in the light most favorable to the prosecution," we find the verdict is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

Issue two is overruled. *Clewis v. State,* 922 S.W.2d 126, 134 (Tex.Crim.App.1996).

## ACCOMPLICE WITNESS TESTIMONY

 Zapata's third issue contends the evidence is legally insufficient because the testimony of the accomplice witnesses was not adequately corroborated. TEX.CODE CRIM. PROC. ANN. art. 38.14 (Vernon 1979) provides that a conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed and the corroboration is not sufficient if it merely shows the commission of the offense. In determining whether the accomplice witnesses' testimony is corroborated, we eliminate all accomplice evidence from the record and decide whether the other inculpatory facts and circumstances in evidence tend to connect the accused to the offense. *See Hernandez v. State,* 939 S.W.2d 173, 176 (Tex. Crim.App.1997); *Munoz v. State,* 853 S.W.2d 558, 559 (Tex.Crim.App.1993). It is not necessary that the non-accomplice evidence is sufficient in itself to establish the accused's guilt beyond a reasonable doubt or that it directly link the accused to the commission of the offense. *Hernandez,* 939 S.W.2d at 176. The rule is satisfied if there is some non-accomplice evidence tending to connect the accused to the commission of the offense. *Id.*

The physical evidence introduced at trial places Zapata at the scene of the crime and inside the taxi on the driver's side. A bullet recovered from the taxi was fired from the same weapon used to fire a bullet into a tree on Zapata's property. Danny Williams testified Brock came to his house along with Golden to borrow a .22 revolver. That gun was eventually turned over to the police and ballistics tests confirmed that one of the .22 bullets removed from Pearson's head was fired from that gun. Zapata's statement to the police also placed him at the scene. Zapata admitted to helping pull Pearson out of the taxi and driving it. Zapata said upon returning home he immediately threw away the clothes and shoes he had been wearing.

This evidence corroborates the accomplice-witness testimony and tends to connect Zapata to the offense. It does far more than merely show the commission of the offense. Issue three is overruled.

## VIENNA CONVENTION

### *Motion to Suppress*

 Issue four complains the trial court erred in denying Zapata's motion to suppress his written statement. Zapata filed a motion to suppress his written statement for violation of the Vienna Convention on Consular Relations. Zapata contended he was not informed of his right as a Mexican national to contact the Mexican consulate or immediately given an opportunity to contact the consulate, in accordance with the Vienna Convention. The trial court denied the motion and the statement was introduced into evidence.

Our Court of Criminal Appeals has recently decided this issue in *Rocha v. State,* 16 S.W.3d 1 (Tex.Crim.App. 2000). Here the court held that "treaties do not constitute 'laws' for Article 38.23 purposes." *Rocha,* 16 S.W.3d at 14 ; *see* TEX. CODE CRIM. PROC. ANN. art. 38.23 (Vernon Supp. 2000). This issue is overruled.

### *Requested Jury Instruction*

 In his fifth issue, Zapata argues the trial court erred in denying his request to include an article 38.22 [4] instruction in the jury charge concerning the voluntariness of his statement. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 (Vernon 1979). Zapata then contends in issue six that the

---

**4.** Zapata's brief erroneously refers to article 38.23, but it is article 38.22 that provides for

such an instruction.

trial court erred in denying his request to instruct the jury regarding the violation of the Vienna Convention. We consider these issues together as the import of the violation is that it rendered the statement involuntary. Thus, only one instruction would be required due to such a violation, that provided by article 38.22 where a question is raised as to the voluntariness of a statement by the accused. *See* Tex. Code Crim. Proc. Ann. art. 38.22 §§ 6, 7 (Vernon 1979).

 Article 38.22, section 7 provides, "When the issue is raised by the evidence, the trial judge shall appropriately instruct the jury, generally, on the law pertaining to such statement." The jury charge contains no such instruction. "However, before the requested instruction is required, some evidence must be presented to the jury which raises the issue of voluntariness." *Butler v. State*, 872 S.W.2d 227, 236 (Tex.Crim.App.1994). *See also Brownlee v. State*, 944 S.W.2d 463, 467 (Tex.App.—Houston [14th Dist.] 1997, pet. ref'd). In the instant case, there is no dispute as to the facts surrounding Zapata's statement. Zapata only testified at the hearing on the motion to suppress. Thus, although Zapata contested the voluntariness of his statement in seeking to suppress it, no such evidence was placed before the jury. Accordingly, no instruction was required. Issues five and six are overruled.

## CONCLUSION

The judgment of the trial court is AFFIRMED.