`
In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-02-208 CR


____________________



JOHN NEVIL BREWER, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 258th District Court


San Jacinto County, Texas


Trial Cause No. 8369






OPINION


 John Nevil Brewer was charged with the capital murder of Stephen Wayne Sasser
by shooting him with a firearm in the course of committing or attempting to commit a
robbery. A jury found him guilty of capital murder. As the State did not seek the death
penalty, Brewer was automatically sentenced by the trial court to life imprisonment. Tex.
Pen. Code Ann. § 12.31(a) (Vernon 2003). Timely notice of appeal was filed. 

 Brewer contends that the evidence was legally and factually insufficient to support
the jury's finding of guilt, both as to the capital murder and the underlying offense of
robbery, and also contends error by the trial court in failing to grant his motion for new
trial based upon an alleged failure of the state to provide him information as required by
Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). For the reasons
stated below, we affirm the murder conviction, reverse and render as to the underlying
robbery conviction, and remand for the assessment of punishment only.

Legal and Factual Sufficiency - - Capital Murder in the Course of Robbery

 A legal sufficiency review requires the reviewing court to view the relevant
evidence in the light most favorable to the verdict and determine whether any rational trier
of fact could have found the essential elements of the crime charged beyond a reasonable
doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979);
Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); Williams v. State, 937 S.W.2d
479, 482 (Tex. Crim. App. 1996). The appellate court in such review acts as a final due
process safeguard ensuring the rationality of the fact finder. Alvarado v. State, 912
S.W.2d 199, 207 (Tex. Crim. App. 1995). In reviewing factual sufficiency, the reviewing
court asks whether a review of all the evidence demonstrates that the proof of guilt is
obviously so weak as to undermine confidence in the trier of fact's determination, or, if
taken alone, the proof of guilt is greatly outweighed by contrary proof. Johnson, 23
S.W.3d at 11. See also Bustamante v. State, 106 S.W.3d 738, 740 (Tex. Crim. App.
2003); Zuliani v. State, 97 S.W.3d 589, 593-94 (Tex. Crim. App. 2003). Although in a
factual sufficiency review the reviewing court is authorized to disagree with the jury's
determination even if probative evidence exists which supports the verdict, a reviewing
court must give due deference to the jury's determination concerning the weight and
credibility of the evidence, and will reverse the jury's determination only to arrest the
occurrence of a manifest injustice. Swearingen v. State, 101 S.W.3d 89, 97 (Tex. Crim.
App. 2003).

 In capital murder committed during the course of a robbery, see Tex. Pen. Code
Ann. § 19.03(a) (Vernon 2003), the legal and factual sufficiency standards apply to both
the charged and underlying offense. Matamoros v. State, 901 S.W.2d 470, 474 (Tex.
Crim. App. 1995); Drew v. State, 76 S.W.3d 436, 444-47 (Tex. App.--Houston [14th
Dist.] pet. ref'd), cert. denied, 537 U.S. 1047, 123 S.Ct. 601, 154 L.Ed.2d 520 (2002). 
To establish the "murder" element of the charged offense, the State must prove the
defendant intentionally or knowingly caused the death of an individual. Rey v. State, 897
S.W.2d 333, 340 n. 7 (Tex. Crim. App. 1995); Tex. Pen. Code Ann. § 19.02(a) (Vernon
2003). To establish capital murder committed during the course of robbery, the State must
prove, inter alia, in addition to the murder, that the defendant possessed the specific intent
to obtain or maintain control of the victim's property either before or during the
commission of the murder. Maldonado v. State, 998 S.W.2d 239, 243 (Tex. Crim. App.
1999); Zapata v. State, 15 S.W.3d 661, 664 (Tex. App.--Beaumont 2000, no pet.). Proof
of a completed theft is not required. Bustamante, 106 S.W.3d at 740; Maldonado, 998
S.W.2d at 243.

 Under the above standards, all evidence, including circumstantial evidence, is
considered. Nguyen v. State, 54 S.W.3d 49, 52 (Tex. App.--Texarkana 2001, pet. ref'd). 
"Circumstantial evidence" is direct proof of secondary facts which, by logical inference,
demonstrates the ultimate fact to be proven. Cowan v. State, 840 S.W.2d 435, 438 n. 10
(Tex. Crim. App. 1992). In the law of evidence, an inference is a fact or proposition
drawn from an admitted or otherwise proven fact. It is a logical consequence flowing from
a proven fact. Marshall Field Stores, Inc. v. Gardiner, 859 S.W.2d 391, 400 (Tex. App.--Houston [1st Dist.] 1993, writ dism'd w.o.j.)(op. on reh'g). If circumstantial evidence
provides no more than a suspicion, the jury is not entitled to reach a speculative
conclusion. Id. at 401. 



 We review the evidence in the light most favorable to the verdict:

 On May 28, 2000, around 8:00 a.m., Bryant Matthews arrived at his father's house
in the Bear Creek area of San Jacinto County. Matthews's father was the fire chief of the
Bear Creek Fire Department, and the two of them planned to spend the day repainting the 
fire hydrants in their district. Around 8:30 a.m., Matthews and his father drove down
Shell Oil Road. At that time, Matthews saw a vehicle parked about 75 yards off the road
near a dirt mound where people normally wouldn't drive. He did not have a very good
view of the vehicle and did not approach it at that time. After completing his work for the
day, at approximately 7:00 p.m., Matthews was driving alone past that same area and
noticed the vehicle was still there. He pulled over and walked towards the car. Inside he
observed a male subject, apparently dead, slumped over towards the driver's side, with a
large amount of blood on his head and upper body. Using his two-way radio, he contacted
the San Jacinto County sheriff's office. The doors and trunk of the vehicle were closed,
and the only tire tracks visible were those made by the vehicle at the scene. Matthews did
not check around the vehicle, and remained at the scene until the officers arrived. He did
not recognize the victim. No one else was at the scene prior to the sheriff's arrival. 

 San Jacinto County Deputy Sheriff Pepper Ray Sterner was the first officer to
arrive. He saw a green Pontiac Sunfire, parked about 120-150 feet in a remote, wooded
area. Inside the vehicle, on the passenger side, he saw what appeared to be a white male,
slumped over to the right, towards the windows. The victim was described as
"discolored" and "bloated." 

 The police investigator estimated the body had been there one or two days in the
warm temperatures. The victim had a shotgun wound to the left neck area, shot from a
very close range. This wound was determined by the Harris County Medical Examiner
to be the cause of death. The investigator found blood and bodily fluids from the victim
inside the car, but did not find splattered blood inside the vehicle consistent with a gunshot
wound. This led the investigator to conclude that the victim had been shot at another
location, and then placed in the vehicle. The victim was identified as Stephen Wayne
Sasser, from his driver's license found in his pants, from the name on cards found in a
wallet recovered from the floorboard of the passenger side of the vehicle, and from
fingerprints. 

 In addition to the wallet, other evidence was recovered from the inside and trunk
areas of the car, including a pair of Levi Straus blue jeans, found laying on Sasser's lap,
waist size 33, length 32, and a black Adidas baseball cap. 

 Javier Flores, a qualified forensic DNA (1) analyst employed by the Texas DPS
laboratory in Houston, conducted analyses of numerous items of evidence from the crime
scene and items acquired during the course of the investigation. He testified that DNA
may be found, inter alia, in skin cells, blood, or urine. (2) Among the items he tested were
the Levi jeans, and blood samples obtained from both Brewer and Sasser. Specifically,
he tested a stain located on the front part of the jeans (blood on the top and skin cells or
urine underneath) and compared this to blood samples from the victim and the defendant. 
Flores testified that in conducting such examinations, he customarily seeks thirteen
different locations for such testing, but due to decomposition of the substance tested, he
was only able to identify five locations. Sasser and Brewer could not be excluded in four
of the five locations as contributors to the stain found on the jeans. Flores's report stated:
"The DNA profile from the stain on the front upper left thigh area of the jeans found on
the victim's lap . . . is consistent with a mixture from John Brewer and Stephen Sasser. 
Mr. Brewer cannot be excluded as a contributor to the stain at the (four specified locations)
. . . . The probability of selecting an unrelated person at random who could be a
contributor to this stain is approximately 1 in 136 for Caucasians, 1 in 198 for Blacks, and
1 in 105 for Hispanics. The approximate world population is 6 billion."

 Barbara Kay Long had, at the time of the incident in question, known Sasser and
Brewer about five months. On May 26, 2000, Long and Brewer left a local bar called the
Buffalo Too at the closing time of 2:00 a.m. and went to Brewer's home, a camping trailer
next to his mother's house. They intended to meet Stephen Sasser in order to get
methamphetamines, which Sasser brought to them. Sasser left the drugs with them,
putting one part in the freezer, and Brewer and Long broke several packages down. Long
testified that Brewer owed Sasser a lot of money, and she saw Brewer pay Sasser several
hundred dollars, which apparently paid most, if not all, his debt. Sasser stayed for about
an hour, then left to get more drugs. Long testified that when Sasser left, he had the
money that Brewer had just paid him, plus some additional money. After Sasser left,
Brewer became upset over the actual weight of the drugs he had just obtained. Long
testified that she had observed a long shotgun, "that bent over," as well as ammunition,
at Brewer's house. After Sasser left in the early morning hours of May 26, 2000, Long
never saw him again. 

 In May, 2000, Brandon Scott Tucker lived in Cleveland with his wife, Melissa
Walsh. At that time, Tucker had known Sasser and Brewer for a couple of months. 
Sasser had been living with Tucker and Walsh at their mobile home for about two and a
half months. At first, Sasser stayed with them occasionally as he worked off-shore. After
Sasser quit his job, he stayed with them full time, paying them rent. Prior to the events
in question, Tucker asked Sasser to live elsewhere because Tucker's younger sister was
coming to stay with them, and given the small size of their home and lack of privacy, he
did not want anything inappropriate to happen. Tucker last saw Sasser on May 26th. He
came home from work around lunch time and Sasser was there. Sasser gave Tucker his
house key, and then left. 

 Melissa Walsh was Tucker's wife. She first met Sasser at Buffalo Too. She knew
Brewer also, and had introduced Sasser to Brewer. Sasser had been living with them two
to three months at that time. She testified they all got along well. On Friday, May 26th,
Walsh was off work and at home, sleeping part of the day. She testified that Sasser was
there in the morning. Walsh, Tucker, and Tucker's sister planned to leave town for a
family reunion Friday morning, but delayed their trip because Walsh wanted to sleep.
Sasser left their home around 11:30 a.m., Friday morning, May 26th. When they returned
home between 6:00 and 8:00 a.m. Sunday morning, May 28th, they knew Sasser had not
been there because a note Walsh had written to him before they left had not been moved. 
Several people called their house looking for Sasser. Walsh called Brewer, concerned
about Sasser's whereabouts. She testified that on May 28th, Brewer told her he had not
seen Sasser for a couple of days, and told her that Sasser was supposed to be on his way
to Brewer's house on Saturday morning, but he never arrived. Walsh testified that on
Monday, the 29th, the sheriff came to their house and talked to them, and after he left,
they went to Buffalo Too. They later saw Brewer, who seemed to be very upset and
genuinely concerned. Walsh denied she was involved in or with drugs. She did not
consider Brewer and Sasser to be close friends. She was aware that Brewer owed some
kind of debt to Sasser, but testified she did not know about any payment that Brewer had
made to Sasser. 

 Christopher Rutherford was a friend of Calvin Brewer, John Brewer's brother. He
also knew John Brewer. On Friday, May 26th, Rutherford visited Calvin Brewer's trailer
around noon. Calvin's trailer, John's trailer, and their mother's house were all in the same
area. Rutherford talked to Calvin while Calvin repaired a lawn mower. Rutherford
testified he heard a noise:

 A. [Rutherford] I heard what could've been something in the front yard,
could've been a car door shutting. I don't know what it could've been. I
really wasn't paying much attention.


 Q. [The State] But you heard a loud noise?


 A. I heard a noise, yeah.


 Q. How would you describe it, as a loud bang, boom, slam?


 A. No. Just -- you know, you're in the country out there. Just a noise that
wasn't a normal bird chirping.


 Q. Okay. So you heard a noise that you couldn't necessarily identify?


 A. Right


 Q. Was it loud?


 A. Well, not too loud, no.


The sound was not enough for Rutherford to investigate. Rutherford and Calvin Brewer
continued talking, walking back and forth inside and outside. Rutherford then saw a green
car, which he knew to be "Steve's" car, drive past his location at a high rate of speed, and
leave the Brewer property without stopping. Rutherford did not know Steve's last name,
but had seen John Brewer and Steve together a lot and he recognized Steve as the owner
of the green car. There appeared to be two people in the car, one of whom had on a
baseball cap, but he could not identify them because the windows were tinted. He
estimated that he had not been at Calvin's house for more than one-half hour when he saw
the car drive past. Rutherford testified that he later remembered Calvin getting a telephone
call. He then left with Calvin in Calvin's truck and they drove to the Western Auto in
Cleveland to pick up a lawn mower belt, then returned to Calvin's place. Calvin and
Rutherford then left again, ending up at a liquor store on the "Coldspring Highway."
Rutherford testified he and Calvin went inside the liquor store for five minutes, and when
they came out, John Brewer was sitting in Calvin's truck. John was wearing only a pair
of jeans; no shirt and no shoes. He looked "sweaty." John's feet appeared "rough-looking . . . like he had been walking awhile." Rutherford also described Brewer's
appearance as being like he'd been up for a while and looking "high." John told
Rutherford that "he had a confrontation but no big deal." They then stopped at a Stop N
Go in Cleveland for gas, and went back to Calvin's house. Calvin told John he would
have to walk back to his house; Rutherford saw John walk to his own place. 

 Bridgette Peals was John Brewer's ex-girlfriend, who had occasionally lived with
him. She testified that Brewer had access to a gun, which was kept on his mother's wall. 
His mother lived right next door to Brewer's mobile home, in a house. Peals had seen
Brewer shoot the gun out in the woods, just fooling around. He had access to ammunition.
She had previously seen Sasser at Brewer's house. 

 John Brewer's home was approximately one to two miles from the location where
Sasser's body was discovered. There was testimony that Sasser, during his temporary
banishment from Rutherford's and Walsh's home, had gone to live with John Brewer. A
shotgun was recovered from Brewer's mother's home. Texas Ranger Kenneth Hammack,
assisting local authorities in the investigation, interviewed Brewer at his home on May 29,
2000, right after Sasser's body was discovered. Hammack testified to seeing rolled up
carpeting outside Brewer's home, and that the area around the carpeting was wet. In an
interview with Brewer at his home in October, 2000, five months after the body was
discovered, Detective Jim Turner of the San Jacinto County Sheriff's Department testified
that the "original carpeting" inside Brewer's trailer appeared to have been removed and
that loose pieces of other carpeting were being used to cover the floor. He also testified
that he observed a burn pile, approximately six feet in diameter outside Brewer's home. 
A lot of burning had been conducted. Detective Turner had to go to Charleston, South
Carolina, to arrest Brewer. 

 Viewing the evidence favorably to the verdict, we find that a reasonable jury could
logically infer, beyond a reasonable doubt, that John Brewer intentionally or knowingly
caused the death of Stephen Sasser:

 - Stephen Sasser was killed by a shotgun blast to the head;


 - the fatal wound was not inflicted in the car where the body was found, but 
was inflicted elsewhere, and then the body was placed in the car;


 - Brewer had access to a shotgun and ammunition;


 - Brewer knew how to use the shotgun;


 - Brewer was upset on the evening of May 25th, 2000, over the weight of the
drugs Sasser had sold him;


 - Sasser was last seen alive around the noon hour on Friday, May 26;


 - John Brewer lived in a motor home in the vicinity of his brother, Calvin;


 - Christopher Rutherford was at Calvin Brewer's trailer on Friday, May 
26th, 2000; around the noon hour, he heard a loud noise from somewhere 
close by on the premises, and shortly thereafter, observed Sasser's green 
car, with two occupants, one with a baseball cap, leaving the Brewer
residence at a high rate of speed, coming from Brewer's trailer; 


 - the Brewer property was no more than two miles from the location where
Sasser's body was discovered;


 - on the afternoon of May 26th, John Brewer suddenly appeared in Calvin
Brewer's truck outside a liquor store, wearing only jeans, no shirt or shoes,
sweating, and looking like he had been walking for a while;


 - at that time, John Brewer told Chris Rutherford that he had been in a
confrontation;


 - one of the investigating officers observed rolled up, wet carpeting outside 
Brewer's trailer, shortly after Sasser's body was discovered; 


 - another investigating officer, interviewing Brewer at his trailer five months
after the incident, reported that the original carpeting inside had been
removed, loose pieces of other carpeting now covered the floor, and a large
pile of burned material was observed outside his trailer;


 - John Brewer could not be excluded as a contributor to the DNA found in
the stain on the jeans that was recovered from the lap of the victim;


 - a black, Adidas baseball cap was recovered from the crime scene;


 - Sasser's body was discovered on May 28, 2000; it was estimated that the
body had been in the car one to two days, based upon the body's condition
and the hot weather;


 - the Sheriff's department investigated evidence recovered from Sasser's car
indicating the possible presence of parties other than Brewer or Sasser;
however, none of this evidence implicated any individuals within Brewer's
or Sasser's known circle of acquaintances or developed any definite leads
pointing to known individuals;


 - there were no other tire tracks observed in the area where the body was
found in the car; and 


 - Brewer had left town and was arrested in South Carolina.


 The legal sufficiency challenge as it relates to the charge of murder is overruled.


 We next review for factual sufficiency the jury's finding that Brewer murdered
Sasser. In so doing, we examine all of the evidence and determine whether the verdict is
either factually insufficient or is so against the great weight and preponderance of the
evidence that it is manifestly unjust. Johnson, 23 S.W.3d at 7, 9. In addition to the
evidence favorable to the State, cited above, we also note the following:

 - there is no direct evidence that Brewer committed this murder; all
witnesses testified that he or she could not directly implicate Brewer; 


 - in addition to the jeans, a large number of items of physical evidence were
recovered from the car where Sasser's body was found; except for the DNA
on the jeans, none of the evidence implicates Brewer; 


 - fingerprint or DNA evidence was recovered from a Sprite bottle, a
McDonald's drinking cup, a "Leatherman" tool, and a hair sample, found
in Sasser's car, from "unknown persons," which is being kept for future
reference;


 - the shotgun, State's Exhibit 17, was not shown to be the actual murder
weapon; the State's expert testified that, with certain rare exceptions, it was
generally not possible to determine whether a shotgun shell had been
discharged from a specific weapon; 


 - Brewer had planned, before the date of the murder, to get a job out of
state; 


 - Brewer appeared genuinely upset upon learning of Sasser's death;


 - Thomas Hanks, Barbara Long's ex-boyfriend, was never located by the
authorities; Hanks was aware that Sasser and Long hung out together, and,
at that time, Long and Hanks had only been broken up for one or two weeks.


 Reviewing all of the evidence in a neutral light, we cannot conclude that the proof
of Brewer's guilt is so obviously weak as to undermine confidence in the determination of
the jury, nor can we conclude that the proof of guilt is greatly outweighed by contrary
proof. We cannot conclude that the jury's verdict was manifestly unjust; therefore, the
factual sufficiency challenge to murder is overruled. 

 We next examine whether the evidence supporting the underlying offense of robbery
was legally sufficient. There are three pieces of circumstantial evidence that support the
State's position: (1) Brewer's anger over whether Sasser had sold him the agreed-upon
amount of drugs; (2) Brewer's knowledge that Sasser had in his possession at least the
several hundred dollars Brewer had just given him; and (3) the wallet found in the vehicle
at the scene contained several cards indicating Sasser's ownership of same, but contained
no money.

 Item three, above, tends to establish that a theft, a required element of robbery, had
occurred. Items one and two, above, while establishing that Brewer might have a motive
to rob Sasser, do not prove that he had the intent to do so. These are clearly different
mental states. "'Motive' refers to an emotion that would provoke or lead to the
commission of a criminal offense." Casterline v. State, 736 S.W.2d 207, 211 (Tex. App.--Corpus Christi 1987, pet. ref'd) (emphasis added). A person acts with intent with respect
to his conduct or to a result of his conduct when it is his conscious objective or desire to
engage in the conduct or cause the result. Tex. Pen. Code Ann. § 6.03(a) (Vernon
2003). While the evidence is sufficient to permit the jury to logically infer that Brewer had
a provocation that could lead to the commission of a robbery, no logical inference can be
drawn from the evidence that he had formed the requisite conscious objective or desire to
rob Sasser either before or during the commission of the murder. Id. There is neither
physical nor testimonial direct evidence that a theft or robbery of Sasser took place, much
less any direct evidence implicating Brewer in any robbery. Further, there is no physical
or testimonial evidence, direct or circumstantial, that would be probative of the formation
by Brewer of the intent to commit a robbery before or during the murder. The trier of fact
would have to speculate in order to reach such a conclusion. Cf. Herrin v. State, 2002 WL
31839153, 2002 Tex. Crim. App. LEXIS 238 at **15, 18 (Tex. Crim. App. Dec. 18,
2002) (not yet released for publication) (intent to rob not proven by establishing that
defendant had motive; evidence that merely raised a suspicion of robbery not legally
sufficient to support a conviction). 

 We sustain issue number three, that the evidence was legally insufficient to establish
that the murder was committed during the course of a robbery. Having sustained issue
number three, issue number four, the factual sufficiency of the underlying offense, need
not be determined.

Brady Violations

 In Drew, 76 S.W.3d at 447-48, the Fourteenth Court of Appeals stated the
applicable standard of review for alleged Brady violations:

 . . . The prosecution has an affirmative duty to disclose all material
evidence favorable to the defense. McFarland v. State, 928 S.W.2d 482,
511 (Tex. Crim. App. 1996) (citing Brady v. Maryland, 373 U.S. 83, 83
S.Ct. 1194, 10 L.Ed.2d 215 (1963)). Both impeachment evidence and
exculpatory evidence are within the scope of the Brady rule. Wyatt v. State,
23 S.W.3d 18, 27 (Tex. Crim. App. 2000) (citing United States v. Bagley,
473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). The
prosecutor violates the Due Process Clause of the Fourteenth Amendment
when he fails to disclose material evidence that is favorable to the accused. 
Thomas v. State, 841 S.W.2d 399, 404 (Tex. Crim. App. 1992). "Brady
has been extended to include the required revelation to an accused of
material exculpatory evidence in the possession of police agencies and other
parts of the 'prosecutorial team.'" Ex parte Mitchell, 977 S.W.2d 575, 578
(Tex. Crim. App. 1997) (citing Kyles v. Whitley, 514 U.S. 419, 115 S.Ct.
1555, 131 L.Ed.2d 490 (1995)) . . . The three-part test used to determine
"whether a prosecutor's actions have violated due process is whether the
prosecutor (1) failed to disclose evidence (2) favorable to the accused and (3)
the evidence is material, meaning there is a reasonable probability that, had
the evidence been disclosed to the defense, the result of the proceeding
would have been different." Little v. State, 991 S.W.2d 864, 866 (Tex.
Crim. App. 1999).


 In this case, the alleged undisclosed exculpatory evidence came from Chris
Rutherford, who testified at trial as a State's witness. At the hearing on the motion for
new trial, Rutherford testified that about a week after completion of Brewer's trial, he
contacted defense counsel, telling him that he told both investigators and the District
Attorney that he had knowledge that there were individuals who were out to "get" or
"were hunting for" both Sasser and Brewer. Rutherford testified that he told Ranger
Hammack in his interview at least three times that he did not think Brewer killed Sasser,
because he had knowledge that other people were out to kill both Sasser and Brewer. 
Rutherford also testified that he told this information to one of the detectives who
interviewed him. Rutherford also testified that just prior to trial, he informed the District
Attorney that if put on the stand and asked if he thought Brewer had killed Steve Sasser,
he would testify that he did not think so, because he knew of other people out to get both
Sasser and Brewer. At the motion for new trial, he testified he had two sources of
information; someone named "Marty," and his cousin, Kenny Henderson. 

 Defendant's trial counsel testified that he did not interview Rutherford prior to the
trial, but chose to rely on Rutherford's written statement of which he was aware. Counsel
acknowledged that the San Jacinto County District Attorney has an "open file" policy. 
Counsel testified that Rutherford contacted him about a week after the conclusion of the
trial, and that he was surprised to learn about certain people being out to get Sasser and
Brewer. The District Attorney had not furnished him with this information. Had it been
given to him prior to trial, he testified that his investigation, trial preparation, and
questioning at trial would have been significantly different. In post-trial interviews, he
determined from jurors that Rutherford's testimony was regarded as the most significant. 

 District Attorney Scott Rosekrans testified that his office maintained an open file
policy with regard to furnishing information to defense counsel, that the Brewer file,
including the witness list containing Rutherford's name, address, and telephone number,
and the July 3, 2000 written statement of Rutherford were all in the file. Defense counsel
reviewed the file prior to trial. Rosekrans acknowledged that he met with Rutherford prior
to trial, but denied that Rutherford told him if he (Rutherford) were put on the stand and
asked if he thought Brewer killed Sasser, he would say no. Rosekrans further testified that
Rutherford never mentioned anything about people wanting to kill Brewer and Sasser. Had
Rutherford told him that, he would have given such information to defense counsel. 

 Talban Terrell was a criminal investigator that worked in Rosekrans's office. He
was present during Rosekrans's interview with Chris Rutherford, and did not recall
Rutherford either saying that he did not think Brewer killed Sasser because there were
people out to get Sasser, or hear anything about a contract or hit on Brewer or Sasser. 

 Texas Ranger Kenneth Hammack interviewed Rutherford for this case on July 3,
2000. This was his only interview with Rutherford. Sheriff Lacy Rogers was also at this
interview. Ranger Hammack testified that everything Rutherford wanted to put in his
written statement was actually put into the statement. Rutherford was given the
opportunity to correct or change the statement, and signed the statement in his presence. 
Neither Rutherford nor any other witness he interviewed regarding the murder of Stephen
Sasser mentioned anything about a hit, contract, or people wanting to kill Sasser and John
Brewer. Sheriff Rogers was with Ranger Hammack during the interview, and testified that
Rutherford never mentioned anything about a hit or contract being out on Sasser and
Brewer. 

 San Jacinto County Detective Jim Turner also talked to Rutherford about the case. 
He testified that Rutherford never mentioned anything to him about a hit or contract being
out on Sasser or Brewer. He also interviewed other witnesses in the case and none of them
told him anything like that.

 The trial court made no ruling on the motion. It is considered overruled by
operation of law. Tex. R. App. P. 21.8 (a) and (c). For the reasons stated below, we find
no error in overruling the motion. 

 We note the claimed Brady violations were raised in a motion for new trial. The
trial court's determination on a motion for new trial is reviewed under an abuse of
discretion standard. On appeal, the reviewing court does not substitute its own judgment
for that of the trial court, but determines whether the trial court's decision was arbitrary
or unreasonable. The trial court is the sole judge of the credibility of a witness, and it is
the trial judge's call with regard to conflicting evidence on factual matters. Salazar v.
State, 38 S.W.3d 141, 148 (Tex. Crim. App. 2001). The trial court in this case may
simply have made a credibility call. After a careful review of the record on the motion for
new trial, we cannot find that the trial judge abused his discretion in believing the State's
witnesses. 

 In addition, we note that the written witness statement of Rutherford contained
Rutherford's statement to Hammack that Sasser and Brewer had visited his home in the
middle of the night seeking to hide because people were out to get them. It is undisputed
that the report containing the statement about Brewer and Sasser's late night visit to
Tucker's was in the prosecutor's file. The parties agreed that the San Jacinto County
District Attorney's Office maintained an "open file" policy. This "open file" policy, i.e.,
giving defense counsel access to material within the prosecutor's file, is generally
sufficient to comply with Brady. Givens v. State, 749 S.W.2d 954, 957 (Tex. App.--Fort
Worth 1988, pet. ref'd). While recognizing that in certain instances, such policy may not,
in and of itself, ensure compliance with Brady, see Vega v. State, 898 S.W.2d 359, 361-62
(Tex. App.--San Antonio 1995, pet. ref'd), where the prosecutor gives access to his or her
file to defense counsel, making it possible for defense counsel to put the exculpatory
evidence contained therein to effective use at trial, there is no Brady violation. Todd v.
State, 911 S.W.2d 807, 818 (Tex. App.--El Paso 1995, no pet.). Further, the record
indicates that trial counsel was aware that Rutherford would be called as a witness, and that
defense counsel did not explain why he could not have interviewed him prior to trial. 
Counsel testified that he expected Rutherford to testify in conformity with his written
statement. The record of the trial shows that defense counsel did not question Rutherford
at all regarding the middle of the night incident involving Brewer and Sasser. In cases of
equal availability, the defendant must bear the responsibility for failure to diligently seek
its discovery. Herrera v. Collins, 954 F.2d 1029, 1032 (5th Cir. 1992), aff'd, 506 U.S.
390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). 

 The trial judge could also have determined that the information was not material. 
Rutherford's alleged knowledge of other individuals out to get Sasser and Brewer does not
take away or detract from his testimony as to what he observed on May 26th. His
testimony in court about hearing a loud noise and observing Sasser's car leaving Brewer's
house with two individuals, one of whom wore a baseball cap, around the noon hour on
May 26th, and the testimony of his encounter with Brewer at the liquor store, looking
sweaty and like he had been walking for a while, was not called into question. This
testimony, which defense counsel admitted to be crucial, was not in any way impeached
by Rutherford's revelations at the motion for new trial. The motion for new trial was
properly overruled. 

Disposition

 Having found the evidence legally and factually sufficient to support Brewer's
conviction for murder, but legally insufficient to support his conviction for capital murder
committed while in the course of committing a robbery, see Tex. Pen. Code Ann. § 
19.03(a) (2) (Vernon 2003), we reform the judgment of the trial court to reflect Brewer's
conviction for murder and remand the cause for the assessment of punishment. Watkins
v. State, 880 S.W.2d 16, 21-22 (Tex. App.--Tyler 1993, pet. ref'd).

 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR A
DETERMINATION OF PUNISHMENT ON THE OFFENSE OF MURDER.


 

 ______________________________

 STEVE MCKEITHEN

 Chief Justice 



Submitted on September 4, 2003

Opinion Delivered January 14, 2004

Publish


Before McKeithen, C.J., Burgess and Gaultney, JJ.




CONCURRING AND DISSENTING OPINION


 I concur insofar as the majority finds the evidence legally insufficient to support the
conviction for capital murder. However, I do not believe the evidence is factually
sufficient for any conviction.

 The majority notes nineteen items from which they claim a jury could logically infer
Brewer killed Sasser:


  the first two simply speak to the death by shotgun blast at someplace other
than the car;

  the next two state Sasser's access to and knowledge of the use of a shot
gun; (3)

 the next several indicate some animosity and an apparent confrontation
between Brewer and Sasser;

  the next couple involve carpeting from Brewer's trailer;

  the next one declares Brewer could not be excluded was a contributor to
DNA found on Sasser's jeans;

  the next attempts to establish the date of death;

 the next shows the Sheriff's Department could not tie any of the items found
in Sasser's car to any known individual;

 the next fairly establishes no other vehicle was around Sasser's car; and

 the last shows Brewer had left the area and was arrested in South Carolina.



 The majority notes seven items which apparently are not favorable to the state:



 the first acknowledges there is no direct evidence implicating Brewer;

 the next two acknowledge that none of the physical evidence, except for the
DNA on the jeans, implicates Brewer and there was fingerprint, DNA and
hair evidence found in Sasser's car from "unknown persons";

 the next simply acknowledges the actual murder weapon was never found;

 the next acknowledges that Brewer's trip had been planned before the
murder; therefore the trip may not have been "flight" after the murder;

 the next noted Brewer "appeared genuinely upset upon learning of Sasser's
death; and

 the last notes another possible suspect was never located.



 The majority, quite correctly, finds the evidence of a robbery legally insufficient
because "[t]he trier of fact would have to speculate in order to reach such a conclusion." 
I contend the same is true for the murder itself. 

 The only evidence cited by the State which connects Brewer to the death of Sasser
is the DNA found on Sasser's jeans. The DPS forensic analyst testified he could not
"exclude" Brewer as a contributor, therefore he was included. This exclusion evidence
is acknowledged by the majority and, as I appreciate it, shows that the probability that
someone other than Brewer or one of his relatives could have been a contributor is 1 in
136. Under the State's evidence, there is in excess of 42 million people who could have
been a contributor. (4) That Brewer was, in fact the contributor, is pure speculation. (5) 

 The weakness of this DNA evidence plus the fingerprint, DNA and hair evidence
found in Sasser's car from "unknown persons" makes the verdict so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust. Johnson v. State,
23 S.W.3d 1, 7 (Tex. Crim. App. 2000). Consequently, I would acquit totally.





 
 
 DON BURGESS

 Justice


Opinion Delivered

January 14, 2004

Publish
1. Deoxyribonucleic acid. 
2. Flores testified that he takes DNA from a biological material found at a crime
scene and compares it with DNA from a blood sample taken from a suspect or any other
person and compares them. Every person's DNA is different; in theory, only identical
twins have the same DNA. 
3. No one can argue there must be hundreds of thousands of individuals within a 100
mile radius of San Jacinto County, this writer included, who has access to and a knowledge
of shotguns.
4. The world population of 6 billion divided by 136. 
5. Would any court let a 7/10% probability (1/136) establish paternity?