NUMBER 13-06-00075-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


JONATHAN GABRIEL SALAZAR, Appellant,


v.


THE STATE OF TEXAS, Appellee.

 


On appeal from the 377th District Court of Victoria County, Texas.

 


MEMORANDUM OPINION


Before Chief Justice Valdez and Justices Rodriguez and GarzaMemorandum Opinion by Chief Justice Valdez

 

 Appellant, Jonathan G. Salazar appeals from his conviction and life sentence for
capital murder. See Tex. Penal Code Ann. § 19.03(a)(2) (Vernon Supp. 2007). At trial,
the State argued that Salazar, an alleged gang member, participated in the kidnapping and
murder of Michael Rodriguez. In four issues, Salazar: (1) challenges the sufficiency of the
evidence supporting his participation in the kidnapping; (2) challenges the sufficiency of the
evidence supporting his participation in the murder; (3) asserts that the trial court erred in
allowing uncorroborated accomplice testimony; and (4) argues that the trial court erred in
denying his motion to sever his case from a co-defendant's trial. We affirm. 

I. BACKGROUND On the morning of December 6, 2003, Victoria County Sheriff's Deputy Mark Zimmer
discovered the body of Michael Rodriguez on a desolate dirt road during a routine patrol. 
Rodriguez had died from numerous gunshot wounds to the head, abdomen, and
extremities. Investigators in the sheriff's office suspected that Rodriguez's murder was
related to a gang war that was being waged between two rival gangs--the Raza Unida
gang ("RU") and the Hermanos Pistoleros gang ("HPL"). On December 9, 2003,
Rodriguez's mother's house was the target of a drive-by shooting, which strengthened the
investigators' belief of gang involvement. 

 Frances Rodriguez, Michael's sister, testified that she was standing in front of her
mother's house when the drive-by shooting took place; she identified the car used in the
drive-by as a white Ford Escort. Later that day, a sheriff's surveillance unit spotted a white
Ford Escort that matched Frances's description and stopped the vehicle after a short
evasion. Thurmond Marshall, a deputy with the Victoria County Sheriff's Office, testified
that Terry Olesky darted out of the vehicle once it stopped and ran away from the
authorities; Olesky tripped, fell, and was apprehended several yards from the car. Deputy
Marshall further testified that Olesky had a revolver on him when he was apprehended. 
A search of the vehicle revealed another revolver that was located underneath the front
passenger's seat.

 Shortly after midnight on December 10, 2003, a search warrant was executed on
a mobile home where Ashley Hensley, D.M., Hensley's one-year old son, and Chris
Adams, Jr., resided. (1) The record does not readily reveal the basis for the search warrant,
but several witnesses testified at trial that Olesky and Hensley were romantically linked and
lived together. Investigator Robert Bianchi participated in the search and testified that the
search yielded a .22 caliber revolver, ammunition, $4,000 in cash, crack cocaine, and
marihuana. 

 After nearly a year of investigating Rodriguez's murder, Salazar was indicted on two
counts of capital murder. (2) The first count alleged murder while engaging in organized
criminal activity; specifically, that Salazar, Terry Olesky, Baldemar Saenz III, and Cruz
Rosales entered into a combination to kill Rodriguez. The second count alleged that
Salazar kidnapped and killed Rodriguez. Salazar and Saenz were tried together. (3)

 Adams testified regarding gang violence before Rodriguez's murder. Though
Adams was not an RU member, he was closely affiliated with the gang. RU supplied
Adams with drugs, which he in turn sold on the street. Olesky, an RU member, was
romantically involved with Hensley, Adams's sister, and lived with them; Salazar, an RU
member, also stayed at Adams's house. According to Adams, RU and HPL were involved
in a gang war in Victoria. The drive-by shooting death of a six-year-old boy, who was the
child of a gang member, upset RU members, and as Adams stated, "[e]veryone wanted
revenge."

 Hensley testified that she saw Olesky, Salazar, Rosales, and Saenz at her home
on the evening of December 5, 2003. The four had dinner and then left the home at
around 7:00 p.m. 

 At approximate 7 or 8 o'clock in the evening on December 5, 2003, Michael
Rodriguez and J.G., Rodriguez's best friend, were walking down a street in their
neighborhood when they were approached by a car driven by Olesky. J.G. testified that
Olesky wanted to know where Jody Deases, J.G.'s older brother, lived because Olesky
wanted to sell Deases a microwave. J.G. and Rodriguez entered Olesky's car to go to
Deases's house. Upon entering the car, J.G. noticed that there was a gun in the front seat. 
Once the group arrived at Deases's house, J.G. went into the house with Olesky and
proceeded to the bathroom. When J.G. got out of the bathroom, Olesky had left.

 Deases testified that Olesky, Rosales, and J.G arrived at his house on the evening
of December 5, 2003. Olesky told Deases that he "got that guy that came out of the [HPL]
case" and that he was going to take care of him. Olesky also sold Deases a microwave
and told him not to say anything or else he would die. Deases called Salazar, who told
Deases that "we're going to take care of this guy." After the group left and J.G. got out of
the bathroom, J.G. told Deases that Olesky had Rodriguez with him. Deases called Olesky
and told him to let Rodriguez go, but Olesky told him "what's got to be done got's to be
done." 

 Rosales, a passenger in Olesky's car, testified about picking up J.G. and Rodriguez
and visiting Deases. Rosales testified that he, Olesky, and Salazar were driving around
Victoria when they spotted J.G. and Rodriguez walking on the street. J.G. approached the
car and asked for a ride to Deases's house and the two boys entered the car. Rosales
further testified that when they got to Deases' house he, J.G., and Olesky entered and
Salazar and Rodriguez stayed outside. While the three individuals were inside the house
Deases looked out the window and saw Rodriguez sitting in the car. Deases then told
Olesky that Rodriguez was related to an HPL member. Olesky and Rosales returned to
the car, without J.G., and left. While inside the car, Olesky told the occupants that
Rodriguez was related to an HPL member, but Rodriguez denied Olesky's accusation. The
group picked up Saenz, stopped at Olesky's home to get money for gas, visited a
convenience store to purchase snacks, and proceeded to a desolate road.

 Rosales noted that the individuals were joking with Rodriguez but that he never got
out of the car until the car was parked on the desolate road. According to Rosales, the RU
members in the car, however, knew that something was going to happen. Rosales thought
that they were going to only beat up Rodriguez. Once the group arrived at the rural county
road they got out of the car and gathered behind it. Olesky pointed his gun at Rodriguez,
who said "You go to hell," and then Olesky shot him in the head with a .38 caliber revolver. 
Salazar and Saenz also fired on Rodriguez with .38 caliber revolvers. After Olesky,
Salazar, and Saenz had fired their rounds, Olesky handed Rosales a .22 caliber revolver
and told him to fire. Rosales fired into the ground beside Rodriguez. The group then went
to Adams's house where Rosales handed his gun back to Olesky, who disposed of it.

 Adams also testified about events shortly before and after Rodriguez's murder. 
Adams testified that he saw the group pull up to his house on the evening of the murder. 
Olesky exited the car, approached Adams, and purchased marihuana from him. According
to Adams, Olesky purchased the marihuana because he wanted to "get Rodriguez high"
before they shot him. Adams further testified that Rodriguez remained in the car during
the visit and that Rosales and Salazar were standing outside the car with guns. After
Rodriguez's murder, the RU members returned to Adams's house to dispose of certain
clothing items. Adams took Salazar's shoes, which contained blood spatter, Saenz' shirt,
and other clothing articles from Rosales and Olesky. Adams gave the members new
clothes, put the old clothes in a plastic bag, and gave the bag to Olesky.

 Hensley testified that after Olesky had dinner, he left with three other individuals,
and she did not see him again until approximately 2:00 a.m. on the following day. At that
time only Olesky and Salazar returned to the home.

 Kerry Lopez, Olesky's sister, testified that she and Kimberly, their other sister, spoke
with Olesky a day or two after Rodriguez's murder. According to Lopez, Olesky,
accompanied by Salazar, Saenz, and Rosales, drove up to Lopez's house in the late
morning; Lopez and her sister spoke to Olesky while he and the others were in a parked
car. When Kimberly mentioned Rodriguez's murder, Salazar "just laughed" and Olesky put
his head down and took a sip from his beer. Lopez further testified that Salazar had a gun
during that morning visit, and that she had seen him armed on other occasions. 

 The prosecution presented forensic evidence from a medical examiner, a firearms
expert, and a crime scene investigator trained in tire and shoe track tracking. Vladimir
Parungao, M.D., a pathologist, testified that the wounds to Rodriguez were caused by a
large caliber bullet. A toxicology report revealed that Rodriguez had used marihuana
before his death. The firearms expert and crime scene investigator could not match 
evidence from the scene to the suspects.

 The jury was instructed to find Salazar guilty of capital murder if it believed beyond
a reasonable doubt that he murdered Rodriguez: (1) in the course of committing or
attempting to commit kidnapping; or (2) while engaging in organized crime. (4) The jury was
additionally instructed to consider Rosales as an accomplice as a matter of law and to
consider Adams as an accomplice as a matter of fact. The jury returned a verdict of guilty
on both capital murder counts. Salazar was sentenced to life in prison, and this appeal
ensued.

II. DISCUSSION (5) By his third issue, Salazar argues that the testimony of Adams and Rosales should
be eliminated from our review because they were accomplices and the prosecution did not
present enough corroborating evidence linking Salazar to the crime. Salazar urges us to
review the evidence through the lens of the accomplice witness rule and reverse his
conviction because there is insufficient evidence to support his participation in Rodriguez's
kidnapping and murder.

A. The Accomplice Witness Rule

 "A conviction cannot be had upon the testimony of an accomplice unless
corroborated by other evidence tending to connect the defendant with the offense
committed; and the corroboration is not sufficient if it merely shows the commission of the
offense." Code Crim. Proc. Ann. art. 38.14 (Vernon 2005). The test for weighing the
sufficiency of corroborative testimony is to eliminate from consideration the accomplice
witness's testimony and examine the other evidence to see whether there is any evidence
that tends to connect the accused with the commission of the crime. Hernandez v. State,
939 S.W.2d 173, 176 (Tex. Crim. App. 1997). The corroborative evidence need not be
sufficient in itself to establish guilt, nor must it directly link the accused to the commission
of the offense; the accomplice witness rule is satisfied if there is some non-accomplice
evidence that tends to connect the accused to the commission of the offense alleged in the
indictment. Id. We view the evidence in the light most favorable to the jury's verdict. Gill
v. State, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994).

 Setting aside the testimony of Adams and Rosales, we will consider only other
evidence which tends to connect Salazar to Rodriguez's murder. J.G. testified that Salazar
was in the car when Olesky picked up Rodriguez and J.G. and took them to Deases's
house. J.G. testified that he saw a gun in the car. When J.G. emerged from the bathroom
at Deases's house, the group had left. J.G.'s testimony corroborates Rosales's testimony
about the events that occurred shortly before Rodriguez's murder. Deases testified that
he called Salazar and was told, "we're going to take care of this guy [Rodriguez]." The
toxicology report, showing that Rodriguez used marihuana before his death, corroborates
the testimony of Adams that Olesky intended to "get Rodriguez high" before killing him. 

 Thus, the record contains non-accomplice testimony from J.G. and Deases that
places Salazar in Rosales' company near the time of Rodriguez's murder. See Gill, 873
S.W.2d at 49 (providing that, "evidence that an accused was in the company of the
accomplice close to the time of the offense, coupled with other suspicious circumstances,
may tend to connect the accused to the offense."). The record also contains non-accomplice corroboration for some of Adams' testimony--particularly about Olesky's plan
to "get Rodriguez high" before murdering him. We conclude that the occupancy of Olesky,
Salazar, Saenz, and Rosales in the car shortly before Rodriguez's murder, the quantity and
nature of Rodriguez's gunshot wounds, Salazar's statement to Deases that "we're going
to take care of this guy," and the presence of a gun in the car when J.G. entered the car
constitutes circumstances suspicious enough to link Salazar to Rodriguez's murder. We
overrule Salazar's third issue.

B. Issues 2 and 3: Challenges to the Sufficiency of the Evidence

 By his first and second issues, Salazar challenges the sufficiency of the evidence
supporting his conviction on count two of the indictment, which read:

On or about the 6th day of December, 2003, in the County of Victoria, State
of Texas, the Defendant did then and there intentionally or knowingly cause
the death of an individual, Michael Rodriguez, by shooting the said Michael
Rodriguez with a deadly weapon, to wit: a firearm, and the Defendant did
then and there intentionally commit said murder in the course of committing
or attempting to commit kidnapping . . . 


Salazar argues that there is insufficient evidence, in light of the accomplice witness rule,
to support a finding that he participated in Rodriguez's kidnapping and murder. As
previously noted, we have overruled Salazar's third issue and will therefore comb the entire
record in our sufficiency of the evidence review. See Code Crim. Proc. Ann. art. 38.14.

1. Standards of Review

 When reviewing challenges to the legal sufficiency of the evidence, we apply
well-established standards. See Jackson v. Virginia, 443 U.S. 307, 319 (1979). We view
the evidence in the light most favorable to the verdict and determine whether any rational
trier of fact could have found the elements of the offense beyond a reasonable doubt.
Vodochodsky v. State, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). The jury, as sole
judge of the witnesses' credibility and the weight to be given their testimony, is free to
accept or reject any or all of the evidence presented by either side. See Margraves v.
State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).

 In a factual sufficiency review, we view all of the evidence in a neutral light and ask
whether a jury was rationally justified in finding guilt beyond a reasonable doubt. See
Watson v. State, 204 S.W.3d 404, 415 (Tex. Crim. App. 2006). In conducting this review,
we are permitted to substitute our judgment for the jury's on the question of witness
credibility and weight of evidence determinations, "albeit to a very limited degree." See
Marshall v. State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006). We will reverse a verdict
of guilty on a factual sufficiency challenge only when we can say, with some objective basis
in the record, that the great weight and preponderance of the evidence contradicts the
jury's verdict. See Watson, 204 S.W.3d at 417.

2. Review of the Sufficiency of the Evidence

 In capital murder offenses committed during the course of a kidnapping, see Tex.
Penal Code Ann. § 19.03(a)(2), the legal and factual sufficiency standards apply to both
the charged and underlying offenses. Matamoros v. State, 901 S.W.2d 470, 474 (Tex.
Crim. App. 1995); Brewer v. State, 126 S.W.3d 295, 297 (Tex. App.-Beaumont 2004, pet.
ref'd). To establish the murder portion of the charged offense, the State must prove
beyond a reasonable doubt that the defendant intentionally or knowingly caused the death
of an individual as charged in the indictment. Tex. Penal Code Ann. § 19.02(a); Rey v.
State, 897 S.W.2d 333, 340 n.7 (Tex. Crim. App. 1995); Brewer, 126 S.W.3d at 297. A
person commits kidnapping if he intentionally or knowingly abducts another person. See
Tex. Penal Code Ann. § 20.03(a) (Vernon 2003). "Abduct" is defined, in part, as "to
restrain a person with intent to prevent his liberation by . . . using or threatening to use
deadly force." Id. § 20.01(2)(B) (Vernon Supp. 2007). "Restrain" means to restrict a
person's movements without consent, so as to interfere substantially with the person's
liberty, by moving the person from one place to another or by confining the person. Id. §
20.01(1). 

 After reviewing the entire record under the appropriate standards, we conclude the
evidence in this case is legally and factually sufficient to support Salazar's conviction for
capital murder. Adams testified that Olesky wanted to purchase marihuana from him so
that the group could "get Rodriguez high" before they killed him. Adams also testified that
Rosales and Salazar were standing outside of the car that they had arrived in with guns
in hand and that Rodriguez was seated in the back. A jury could have reasonably inferred
that the armed individuals restrained Rodriguez's movement. Thus, Adams's testimony
constitutes sufficient evidence of the kidnapping charge that is the basis for Salazar's
capital murder conviction. Additionally, Rosales testified that Salazar fired on Rodriguez
after Olesky opened fire. Thus, there is sufficient evidence supporting the murder portion
of the charged offense. Salazar does not point to any evidence that contradicts the
prosecution's version of what happened. Salazar's first and second issues are overruled.

C. Issue 4: Salazar's Severance Motion

 By his fourth issue, Salazar contends that the trial court erred by denying his
severance motion in light of Saenz's prior conviction. The code of criminal procedure
provides in reference to severance:

Two or more defendants who are jointly or separately indicted or complained
against for the same offense or any offense growing out of the same
transaction may be, in the discretion of the court, tried jointly or separately
as to one or more defendants; provided that in any event either defendant
may testify for the other or on behalf of the state; and provided further, that
in cases in which, upon timely motion to sever, and evidence introduced
thereon, it is made known to the court that there is a previous admissible
conviction against one defendant or that a joint trial would be prejudicial to
any defendant, the court shall order a severance as to the defendant whose
joint trial would prejudice the other defendant or defendants.


Code Crim. Proc. Ann. art. 36.09 (Vernon 2007). Accordingly, severance is not a matter
of right but rests within the sound discretion of the trial court unless a joint trial would, as
a matter of law, prejudice a co-defendant. Smith v. State, 998 S.W.2d 683 , 686 (Tex.
App.-Corpus Christi 1999, pet. ref'd) (citing Garza v. State, 622 S.W.2d 85, 91 (Tex. Crim.
App. 1980); Silva v. State, 933 S.W.2d 715, 719 (Tex. App.-San Antonio 1996, no pet.)). 

 Denial of the right to a severance is a non-constitutional error. See Llamas v. State,
12 S.W.3d 469, 471-72 (Tex. Crim. App. 2000). Texas Rule of Appellate Procedure
44.2(b) provides that a nonconstitutional error "that does not affect substantial rights must
be disregarded." Tex. R. App. P. 44.2(b). A criminal conviction should not be overturned
for non-constitutional error if an appellate court, after examining the record as a whole, has
a fair assurance that the error did not influence the jury or had only a slight effect. Motilla
v. State, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). 

 Assuming, without deciding, that the trial court erred in denying Salazar's severance
motion, we conclude that any improper denial of Salazar's request for a severance was
harmless and did not affect his substantial rights. See Rodriguez v. State, 90 S.W.3d 340,
358 (Tex. App.-El Paso 2001, pet. ref'd); Dominguez v. State, 62 S.W.3d 203, 208 (Tex.
App.-El Paso 2000, pet. ref'd). In the instant case, the prosecution agreed not to offer
Saenz's prior conviction into evidence at the pre-trial hearing on the co-defendants'
severance motions and abided by its agreement. The error, if any, was harmless. 
Salazar's fourth issue is overruled. 

 III. CONCLUSION

 We affirm the trial court's judgment.

 

 

 ROGELIO VALDEZ

 Chief Justice


Do not publish. 

Tex. R. App. P. 47.2(b).


Memorandum Opinion delivered and filed 

this the 10th day of April, 2008.
1. Hensley and Adams are siblings.
2. The State, however, did not pursue the death penalty.
3. Before the trial began, Salazar and Saenz, the co-defendant, filed motions for severance. Salazar
argued that he would be harmed by being tried with Saenz because Saenz had a prior conviction for
possession of a firearm in a school zone. The prosecution, however, agreed to not proffer Saenz's prior
conviction. The trial court denied the severance motions and proceeded to try the two co-defendants together.
4. The jury was also instructed on the lesser included offense of murder.
5. We address Salazar's issues out of order for purposes of more efficient organization. See Tex. R.
App. P. 47.1 (providing that the court of appeals must hand down a written opinion that is as brief as
practicable but that addresses every issue raised and necessary to final disposition of the appeal).