

**NUMBER 13-06-00075-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**JONATHAN GABRIEL SALAZAR,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

**On appeal from the 377th District Court of Victoria County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Garza
Memorandum Opinion by Chief Justice Valdez**

Appellant, Jonathan G. Salazar appeals from his conviction and life sentence for

capital murder. *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon Supp. 2007). At trial,

the State argued that Salazar, an alleged gang member, participated in the kidnapping and

murder of Michael Rodriguez. In four issues, Salazar: (1) challenges the sufficiency of the

evidence supporting his participation in the kidnapping; (2) challenges the sufficiency of the

evidence supporting his participation in the murder; (3) asserts that the trial court erred in allowing uncorroborated accomplice testimony; and (4) argues that the trial court erred in denying his motion to sever his case from a co-defendant's trial. We affirm.

## I. BACKGROUND

On the morning of December 6, 2003, Victoria County Sheriff's Deputy Mark Zimmer discovered the body of Michael Rodriguez on a desolate dirt road during a routine patrol. Rodriguez had died from numerous gunshot wounds to the head, abdomen, and extremities. Investigators in the sheriff's office suspected that Rodriguez's murder was related to a gang war that was being waged between two rival gangs—the Raza Unida gang ("RU") and the Hermanos Pistoleros gang ("HPL"). On December 9, 2003, Rodriguez's mother's house was the target of a drive-by shooting, which strengthened the investigators' belief of gang involvement.

Frances Rodriguez, Michael's sister, testified that she was standing in front of her mother's house when the drive-by shooting took place; she identified the car used in the drive-by as a white Ford Escort. Later that day, a sheriff's surveillance unit spotted a white Ford Escort that matched Frances's description and stopped the vehicle after a short evasion. Thurmond Marshall, a deputy with the Victoria County Sheriff's Office, testified that Terry Olesky darted out of the vehicle once it stopped and ran away from the authorities; Olesky tripped, fell, and was apprehended several yards from the car. Deputy Marshall further testified that Olesky had a revolver on him when he was apprehended. A search of the vehicle revealed another revolver that was located underneath the front passenger's seat.

Shortly after midnight on December 10, 2003, a search warrant was executed on a mobile home where Ashley Hensley, D.M., Hensley's one-year old son, and Chris Adams, Jr., resided.[1] The record does not readily reveal the basis for the search warrant, but several witnesses testified at trial that Olesky and Hensley were romantically linked and lived together. Investigator Robert Bianchi participated in the search and testified that the search yielded a .22 caliber revolver, ammunition, $4,000 in cash, crack cocaine, and marihuana.

After nearly a year of investigating Rodriguez's murder, Salazar was indicted on two counts of capital murder.[2] The first count alleged murder while engaging in organized criminal activity; specifically, that Salazar, Terry Olesky, Baldemar Saenz III, and Cruz Rosales entered into a combination to kill Rodriguez. The second count alleged that Salazar kidnapped and killed Rodriguez. Salazar and Saenz were tried together.[3]

Adams testified regarding gang violence before Rodriguez's murder. Though Adams was not an RU member, he was closely affiliated with the gang. RU supplied Adams with drugs, which he in turn sold on the street. Olesky, an RU member, was romantically involved with Hensley, Adams's sister, and lived with them; Salazar, an RU member, also stayed at Adams's house. According to Adams, RU and HPL were involved in a gang war in Victoria. The drive-by shooting death of a six-year-old boy, who was the

---

[1] Hensley and Adams are siblings.

[2] The State, however, did not pursue the death penalty.

[3] Before the trial began, Salazar and Saenz, the co-defendant, filed motions for severance. Salazar argued that he would be harmed by being tried with Saenz because Saenz had a prior conviction for possession of a firearm in a school zone. The prosecution, however, agreed to not proffer Saenz's prior conviction. The trial court denied the severance motions and proceeded to try the two co-defendants together.

child of a gang member, upset RU members, and as Adams stated, "[e]veryone wanted revenge."

Hensley testified that she saw Olesky, Salazar, Rosales, and Saenz at her home on the evening of December 5, 2003. The four had dinner and then left the home at around 7:00 p.m.

At approximate 7 or 8 o'clock in the evening on December 5, 2003, Michael Rodriguez and J.G., Rodriguez's best friend, were walking down a street in their neighborhood when they were approached by a car driven by Olesky. J.G. testified that Olesky wanted to know where Jody Deases, J.G.'s older brother, lived because Olesky wanted to sell Deases a microwave. J.G. and Rodriguez entered Olesky's car to go to Deases's house. Upon entering the car, J.G. noticed that there was a gun in the front seat. Once the group arrived at Deases's house, J.G. went into the house with Olesky and proceeded to the bathroom. When J.G. got out of the bathroom, Olesky had left.

Deases testified that Olesky, Rosales, and J.G arrived at his house on the evening of December 5, 2003. Olesky told Deases that he "got that guy that came out of the [HPL] case" and that he was going to take care of him. Olesky also sold Deases a microwave and told him not to say anything or else he would die. Deases called Salazar, who told Deases that "we're going to take care of this guy." After the group left and J.G. got out of the bathroom, J.G. told Deases that Olesky had Rodriguez with him. Deases called Olesky and told him to let Rodriguez go, but Olesky told him "what's got to be done got's to be done."

Rosales, a passenger in Olesky's car, testified about picking up J.G. and Rodriguez and visiting Deases. Rosales testified that he, Olesky, and Salazar were driving around

4

Victoria when they spotted J.G. and Rodriguez walking on the street. J.G. approached the car and asked for a ride to Deases's house and the two boys entered the car. Rosales further testified that when they got to Deases' house he, J.G., and Olesky entered and Salazar and Rodriguez stayed outside. While the three individuals were inside the house Deases looked out the window and saw Rodriguez sitting in the car. Deases then told Olesky that Rodriguez was related to an HPL member. Olesky and Rosales returned to the car, without J.G., and left. While inside the car, Olesky told the occupants that Rodriguez was related to an HPL member, but Rodriguez denied Olesky's accusation. The group picked up Saenz, stopped at Olesky's home to get money for gas, visited a convenience store to purchase snacks, and proceeded to a desolate road.

Rosales noted that the individuals were joking with Rodriguez but that he never got out of the car until the car was parked on the desolate road. According to Rosales, the RU members in the car, however, knew that something was going to happen. Rosales thought that they were going to only beat up Rodriguez. Once the group arrived at the rural county road they got out of the car and gathered behind it. Olesky pointed his gun at Rodriguez, who said "You go to hell," and then Olesky shot him in the head with a .38 caliber revolver. Salazar and Saenz also fired on Rodriguez with .38 caliber revolvers. After Olesky, Salazar, and Saenz had fired their rounds, Olesky handed Rosales a .22 caliber revolver and told him to fire. Rosales fired into the ground beside Rodriguez. The group then went to Adams's house where Rosales handed his gun back to Olesky, who disposed of it.

Adams also testified about events shortly before and after Rodriguez's murder. Adams testified that he saw the group pull up to his house on the evening of the murder. Olesky exited the car, approached Adams, and purchased marihuana from him. According

5

to Adams, Olesky purchased the marihuana because he wanted to "get Rodriguez high" before they shot him. Adams further testified that Rodriguez remained in the car during the visit and that Rosales and Salazar were standing outside the car with guns. After Rodriguez's murder, the RU members returned to Adams's house to dispose of certain clothing items. Adams took Salazar's shoes, which contained blood spatter, Saenz' shirt, and other clothing articles from Rosales and Olesky. Adams gave the members new clothes, put the old clothes in a plastic bag, and gave the bag to Olesky.

Hensley testified that after Olesky had dinner, he left with three other individuals, and she did not see him again until approximately 2:00 a.m. on the following day. At that time only Olesky and Salazar returned to the home.

Kerry Lopez, Olesky's sister, testified that she and Kimberly, their other sister, spoke with Olesky a day or two after Rodriguez's murder. According to Lopez, Olesky, accompanied by Salazar, Saenz, and Rosales, drove up to Lopez's house in the late morning; Lopez and her sister spoke to Olesky while he and the others were in a parked car. When Kimberly mentioned Rodriguez's murder, Salazar "just laughed" and Olesky put his head down and took a sip from his beer. Lopez further testified that Salazar had a gun during that morning visit, and that she had seen him armed on other occasions.

The prosecution presented forensic evidence from a medical examiner, a firearms expert, and a crime scene investigator trained in tire and shoe track tracking. Vladimir Parungao, M.D., a pathologist, testified that the wounds to Rodriguez were caused by a large caliber bullet. A toxicology report revealed that Rodriguez had used marihuana before his death. The firearms expert and crime scene investigator could not match evidence from the scene to the suspects.

6

The jury was instructed to find Salazar guilty of capital murder if it believed beyond a reasonable doubt that he murdered Rodriguez: (1) in the course of committing or attempting to commit kidnapping; or (2) while engaging in organized crime.[4] The jury was additionally instructed to consider Rosales as an accomplice as a matter of law and to consider Adams as an accomplice as a matter of fact. The jury returned a verdict of guilty on both capital murder counts. Salazar was sentenced to life in prison, and this appeal ensued.

## II. DISCUSSION[5]

By his third issue, Salazar argues that the testimony of Adams and Rosales should be eliminated from our review because they were accomplices and the prosecution did not present enough corroborating evidence linking Salazar to the crime. Salazar urges us to review the evidence through the lens of the accomplice witness rule and reverse his conviction because there is insufficient evidence to support his participation in Rodriguez's kidnapping and murder.

### A.    The Accomplice Witness Rule

"A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." CODE CRIM. PROC. ANN. art. 38.14 (Vernon 2005). The test for weighing the sufficiency of corroborative testimony is to eliminate from consideration the accomplice

---

[4] The jury was also instructed on the lesser included offense of murder.

[5] We address Salazar's issues out of order for purposes of more efficient organization. *See* TEX. R. APP. P. 47.1 (providing that the court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal).

7

witness's testimony and examine the other evidence to see whether there is any evidence that tends to connect the accused with the commission of the crime. *Hernandez v. State*, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997). The corroborative evidence need not be sufficient in itself to establish guilt, nor must it directly link the accused to the commission of the offense; the accomplice witness rule is satisfied if there is some non-accomplice evidence that tends to connect the accused to the commission of the offense alleged in the indictment. *Id*. We view the evidence in the light most favorable to the jury's verdict. *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994).

Setting aside the testimony of Adams and Rosales, we will consider only other evidence which tends to connect Salazar to Rodriguez's murder. J.G. testified that Salazar was in the car when Olesky picked up Rodriguez and J.G. and took them to Deases's house. J.G. testified that he saw a gun in the car. When J.G. emerged from the bathroom at Deases's house, the group had left. J.G.'s testimony corroborates Rosales's testimony about the events that occurred shortly before Rodriguez's murder. Deases testified that he called Salazar and was told, "we're going to take care of this guy [Rodriguez]." The toxicology report, showing that Rodriguez used marihuana before his death, corroborates the testimony of Adams that Olesky intended to "get Rodriguez high" before killing him.

Thus, the record contains non-accomplice testimony from J.G. and Deases that places Salazar in Rosales' company near the time of Rodriguez's murder. *See Gill*, 873 S.W.2d at 49 (providing that, "evidence that an accused was in the company of the accomplice close to the time of the offense, coupled with other suspicious circumstances, may tend to connect the accused to the offense."). The record also contains non-accomplice corroboration for some of Adams' testimony—particularly about Olesky's plan

to "get Rodriguez high" before murdering him. We conclude that the occupancy of Olesky, Salazar, Saenz, and Rosales in the car shortly before Rodriguez's murder, the quantity and nature of Rodriguez's gunshot wounds, Salazar's statement to Deases that "we're going to take care of this guy," and the presence of a gun in the car when J.G. entered the car constitutes circumstances suspicious enough to link Salazar to Rodriguez's murder. We overrule Salazar's third issue.

**B.      Issues 2 and 3: Challenges to the Sufficiency of the Evidence**

By his first and second issues, Salazar challenges the sufficiency of the evidence supporting his conviction on count two of the indictment, which read:

> On or about the 6th day of December, 2003, in the County of Victoria, State of Texas, the Defendant did then and there intentionally or knowingly cause the death of an individual, Michael Rodriguez, by shooting the said Michael Rodriguez with a deadly weapon, to wit: a firearm, and the Defendant did then and there intentionally commit said murder in the course of committing or attempting to commit kidnapping . . .

Salazar argues that there is insufficient evidence, in light of the accomplice witness rule, to support a finding that he participated in Rodriguez's kidnapping and murder. As previously noted, we have overruled Salazar's third issue and will therefore comb the entire record in our sufficiency of the evidence review. *See* CODE CRIM. PROC. ANN. art. 38.14.

*1.      Standards of Review*

When reviewing challenges to the legal sufficiency of the evidence, we apply well-established standards. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). The jury, as sole

judge of the witnesses' credibility and the weight to be given their testimony, is free to accept or reject any or all of the evidence presented by either side. *See Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).

In a factual sufficiency review, we view all of the evidence in a neutral light and ask whether a jury was rationally justified in finding guilt beyond a reasonable doubt. *See Watson v. State*, 204 S.W.3d 404, 415 (Tex. Crim. App. 2006). In conducting this review, we are permitted to substitute our judgment for the jury's on the question of witness credibility and weight of evidence determinations, "albeit to a very limited degree." *See Marshall v. State*, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006). We will reverse a verdict of guilty on a factual sufficiency challenge only when we can say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *See Watson*, 204 S.W.3d at 417.

## 2. Review of the Sufficiency of the Evidence

In capital murder offenses committed during the course of a kidnapping, *see* TEX. PENAL CODE ANN. § 19.03(a)(2), the legal and factual sufficiency standards apply to both the charged and underlying offenses. *Matamoros v. State*, 901 S.W.2d 470, 474 (Tex. Crim. App. 1995); *Brewer v. State*, 126 S.W.3d 295, 297 (Tex. App.–Beaumont 2004, pet. ref'd). To establish the murder portion of the charged offense, the State must prove beyond a reasonable doubt that the defendant intentionally or knowingly caused the death of an individual as charged in the indictment. TEX. PENAL CODE ANN. § 19.02(a); *Rey v. State*, 897 S.W.2d 333, 340 n.7 (Tex. Crim. App. 1995); *Brewer*, 126 S.W.3d at 297. A person commits kidnapping if he intentionally or knowingly abducts another person. *See*

10

TEX. PENAL CODE ANN. § 20.03(a) (Vernon 2003). "Abduct" is defined, in part, as "to restrain a person with intent to prevent his liberation by . . . using or threatening to use deadly force." *Id*. § 20.01(2)(B) (Vernon Supp. 2007). "Restrain" means to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person. *Id*. § 20.01(1).

After reviewing the entire record under the appropriate standards, we conclude the evidence in this case is legally and factually sufficient to support Salazar's conviction for capital murder. Adams testified that Olesky wanted to purchase marihuana from him so that the group could "get Rodriguez high" before they killed him. Adams also testified that Rosales and Salazar were standing outside of the car that they had arrived in with guns in hand and that Rodriguez was seated in the back. A jury could have reasonably inferred that the armed individuals restrained Rodriguez's movement. Thus, Adams's testimony constitutes sufficient evidence of the kidnapping charge that is the basis for Salazar's capital murder conviction. Additionally, Rosales testified that Salazar fired on Rodriguez after Olesky opened fire. Thus, there is sufficient evidence supporting the murder portion of the charged offense. Salazar does not point to any evidence that contradicts the prosecution's version of what happened. Salazar's first and second issues are overruled.

**C.     Issue 4:  Salazar's Severance Motion**

By his fourth issue, Salazar contends that the trial court erred by denying his severance motion in light of Saenz's prior conviction. The code of criminal procedure provides in reference to severance:

Two or more defendants who are jointly or separately indicted or complained

11

against for the same offense or any offense growing out of the same transaction may be, in the discretion of the court, tried jointly or separately as to one or more defendants; provided that in any event either defendant may testify for the other or on behalf of the state; and provided further, that in cases in which, upon timely motion to sever, and evidence introduced thereon, it is made known to the court that there is a previous admissible conviction against one defendant or that a joint trial would be prejudicial to any defendant, the court shall order a severance as to the defendant whose joint trial would prejudice the other defendant or defendants.

CODE CRIM. PROC. ANN. art. 36.09 (Vernon 2007). Accordingly, severance is not a matter of right but rests within the sound discretion of the trial court unless a joint trial would, as a matter of law, prejudice a co-defendant. *Smith v. State*, 998 S.W.2d 683 , 686 (Tex. App.–Corpus Christi 1999, pet. ref'd) (citing *Garza v. State*, 622 S.W.2d 85, 91 (Tex. Crim. App. 1980); *Silva v. State*, 933 S.W.2d 715, 719 (Tex. App.–San Antonio 1996, no pet.)).

Denial of the right to a severance is a non-constitutional error. *See Llamas v. State*, 12 S.W.3d 469, 471-72 (Tex. Crim. App. 2000). Texas Rule of Appellate Procedure 44.2(b) provides that a nonconstitutional error "that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b). A criminal conviction should not be overturned for non-constitutional error if an appellate court, after examining the record as a whole, has a fair assurance that the error did not influence the jury or had only a slight effect. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

Assuming, without deciding, that the trial court erred in denying Salazar's severance motion, we conclude that any improper denial of Salazar's request for a severance was harmless and did not affect his substantial rights. *See Rodriguez v. State*, 90 S.W.3d 340, 358 (Tex. App.–El Paso 2001, pet. ref'd); *Dominguez v. State*, 62 S.W.3d 203, 208 (Tex. App.–El Paso 2000, pet. ref'd). In the instant case, the prosecution agreed not to offer

Saenz's prior conviction into evidence at the pre-trial hearing on the co-defendants' severance motions and abided by its agreement. The error, if any, was harmless. Salazar's fourth issue is overruled.

### III. CONCLUSION

We affirm the trial court's judgment.

_/s/ ROGELIO VALDEZ_
ROGELIO VALDEZ
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Memorandum Opinion delivered and filed
this the 10th day of April, 2008.